2007 BNH 023
_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

In re:                                                                                    Bk. No. 05-15295-MWV
                                                                                          Chapter 7
Howard J. Wunderlich,
           Debtor


*Arthur O. Gormley, III, Esq.*
GORMLEY & GORMLEY, P.C.
*Attorney for Debtor*

*James Moran*
*Pro se*

## MEMORANDUM OPINION

      Following this Court's denial of Howard J. Wunderlich's (the "Debtor") property exemptions claimed under New Hampshire law, the Debtor amended Schedule C to claim property exempt under New York law.  Creditor James Moran filed an objection to which the Debtor filed a response.  The Court took the matter under advisement at the close of a January 30, 2007, hearing.

### JURISDICTION

      This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.).  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

### BACKGROUND

      The Debtor is an attorney who practiced bankruptcy law in New York from 1987 to 2005.  Moran is a judgment creditor of the Debtor who sued the Debtor in 2003 for legal malpractice related to the Debtor's representation of a company owned by Moran that filed for Chapter 11 protection.  The Debtor filed his own Chapter 7 petition in this Court on October 14, 2005.  His original Schedule C claimed a

homestead exemption for a townhouse at 58 Derry Street, Merrimack, New Hampshire (the "New Hampshire address"), and other property exempt under New Hampshire law. Moran objected to the Debtor's claimed homestead exemption on the ground that the New Hampshire address was not the Debtor's domicile or primary residence, and the Court sustained the objection. Moran then objected to the Debtor's other claimed exemptions because the Debtor was not a resident or domiciliary of New Hampshire. The Court sustained that objection, too. The Debtor did not appeal either of the Court's orders disallowing his exemptions. The Debtor then filed an amended Schedule C to claim personal property as exempt under New York law. Moran seeks to defeat the amendment, alleging that the Debtor's initial claim of New Hampshire exemptions was in bad faith, which should prevent the Debtor from now being allowed to claim New York exemptions. Moran also alleges that the Debtor undervalued and concealed assets.

On his bankruptcy petition, the Debtor listed his New Hampshire address as his residence. When he filed his schedules and statement of affairs a couple of weeks later, he indicated at Question 15 of his statement of financial affairs that he had not moved within the prior two years and thus declined to list any additional addresses. At a Rule 2004 examination on February 10, 2006, the Debtor represented that, in the preceding three years, he had not had any addresses other than his New Hampshire address and that this was his primary residence since 2000. (Moran's Ex. C at 82.) He said, "My address is 58 Derry Street. That's where I live. Technically, that's where I've lived for the last several years." (Moran's Ex. B at 84–85.) The Debtor also flatly denied that his parents' house in Ronkonkoma, New York (the "New York address"), was his home in the following exchange:

> A: I was here [in New Hampshire] for a couple days in the middle of December. Then I went back home because I had some doctors' appointments. I went back to Ronkonkoma to their home, stayed there, had some doctors' appointments; and then wound up coming back up here for Christmas for a while.
> Q: Do you know what a Freudian slip is?
> A: Yes.
> Q: Did you just do that when you said, "I went back home"?
> A: They're all homes.
> Q: So Ronkonkoma is your home?

> A: I call everything home.
> Q: Ronkonkoma is your home?
> A: No.
> Q: It's not your home?
> A: No.

(Moran's Ex. C at 78.)

Despite not calling New York home, the Debtor filed a resident tax return in New York in 2003 and also listed the New York address on his federal income tax return for that year.[1] (Moran's Ex. E.) The Debtor's explanation is that he stays at his parents' house when he is in New York and that he used that address out of convenience because he had been away on military commitments. (Moran's Ex. B at 85.)[2] Indeed, many documents list either his parents' Ronkonkama address or an address in Central Islip, New York, including the following: 2005 mortgage interest statements from Digital Federal Credit Union (Moran's Ex. F); a 2005 Form 1099-DIV related to the Debtor's ownership of stocks of Monsanto Company (Moran's Ex. F); a 2006 automobile insurance renewal (Moran's Ex. K); a 2005 document related to a homeowners insurance policy (Moran's Ex. K); and 2004, 2005, and 2006 Fidelity Investments ("Fidelity") account statements (Central Islip address). (Moran's Exs. L, M, and N.)

In addition to using New York mailing addresses, other of the Debtor's actions indicate that New York was his home at the time he filed his bankruptcy petition. For instance, the Debtor explained as follows why he registered his car in New York: "It was registered in New York because the car generally was staying in New York. And I had run into a problem once before with living in one place, having a car registered elsewhere." (Moran's Ex. B at 107.) The Debtor also kept his only furniture, a bedroom set, at the New York address. (Moran's Ex. C at 78.) In fact, the Debtor's parents essentially lived in the New Hampshire address where they owned all of the furniture and had the utilities in their name.

---

[1] The next year, 2004, the Debtor filed a New York state tax return on the form for nonresidents and part-year residents and listed his New Hampshire address as his permanent address. (Moran's Ex. G.)

[2] The Debtor has presented no evidence that he has traveled for military purposes during the times relevant to this case.

(Moran's Ex. B at 104–05, and Ex. D at 97–98.)  Also, a June 2003 document titled "Second Home Rider" contains a provision that the New Hampshire property shall only be used as the Debtor's second home.  (Moran's Ex. I.)  The Debtor did concede at the Rule 2004 examination in February 2006 that moving to New Hampshire was his intention but that he had not "completely moved."  (Moran's Ex. D at 99–100.)  The Debtor's stated intention to permanently move to New Hampshire is inconsistent with his stated intention to reopen his New York law practice.  (Moran's Ex. A at 29.)  Toward that end, the Debtor continued post-petition to pay rent on his office space despite the discontinuance of his practice in 2005.  Meanwhile, the Debtor's only effort towards practicing law in New Hampshire was to look at the New Hampshire Bar Association or New Hampshire Supreme Court website.  (Moran's Ex. D at 52–53, 104–105.)

In addition to alleging the Debtor's bad faith with regard to residency, Moran argues that the Debtor has also acted in bad faith by undervaluing and concealing assets.  On the Debtor's original Schedule B he listed an "IRA" with a value of $35,000 and a "Retirement Plan" valued at $102,000.  (Ct. Doc. No. 8.)  The Debtor's amended Schedule B values the "Gabelli Funds-Roth IRA" at $34,936.98, and lists the retirement plan as composed of two "Fidelity-Keogh" accounts (the "Fidelity accounts") with a total value of $100,929.82.  (Ct. Doc. No. 96.)  The Court granted Moran's motion to compel production of documents, including more recent account statements for the Fidelity accounts.  The account statements provided by Fidelity show that the accounts were worth $136,273.39 one month before the Debtor filed his petition and $146,451.39 as of June 12, 2006, more than two months before he filed his amended schedules.  (Moran's Exs. M and N.)  The Debtor explains that he undervalued the Fidelity accounts at $100,929.82 when he filed his petition in October 2005 and again when he filed his amendments in August 2006 because at both times the only account statement he had was for the period December 11, 2003, to March 11, 2004 (the "March 2004 statement") that showed a total value of $100,929.82.  (Moran's Ex. L.)  Despite the more recent statements showing values of $136,273.39 and $146,451.39, the Debtor has not amended his schedule to reflect a post-2004 value.

The Court has previously denied the Debtor's discharge pursuant to section 727(a)(2)(A)[3] after finding that the Debtor concealed his receipt of approximately $30,000 from a second mortgage on the New Hampshire property less than seven months prior to filing his bankruptcy petition.[4]  After conceding the existence of the second mortgage at the 341 meeting, the Debtor waited another eight months to amend his schedules to show the mortgage.

## DISCUSSION

Moran first argues that the Debtor's amendments should be disallowed because the Debtor checked a box on his amended Schedule B indicating that he claims his state law exemptions pursuant to section 522(b)(3), which section was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA").  The Debtor's counsel acknowledges that he inadvertently used a post-BAPCPA form in this case, which was filed prior to the general effective date of BAPCPA.  Although section 522(b)(3) is not applicable to this case, the amended Schedule C leaves no doubt that the Debtor's intention is to claim exemptions pursuant to New York law.  Therefore, the Court will not disallow the Debtor's amendments for this reason.

Next, Moran argues that the amendments are ineffective because the Debtor violated Federal Rule of Bankruptcy Procedure 1008 by not verifying the amendments or submitting with them an unsworn declaration.  In In re De Jounghe, the debtors attempted to file amended schedules but "they never actually filed amended schedules which were either verified or which contained an unsworn declaration. Consequently, the bankruptcy court did not err in concluding that the schedules were never amended." 334 B.R. 760, 767 (B.A.P. 1st Cir. 2005) (citation omitted).  The Debtor argues that his Declaration Regarding Electronic Filing that was filed with the amendments contains his representation that the

---

[3]  All references to the "Bankruptcy Code" or to specific sections are to the Bankruptcy Reform Act of 1978, as amended prior to April 20, 2005, 11 U.S.C. §§ 101 to 1330.

[4]  The Court's ruling is on appeal and is presently pending before the United States Bankruptcy Appellate Panel for the First Circuit.  Moran v. Wunderlich (In re Wunderlich), 2007 BNH 008.

information contained in the amendments is true and accurate and is therefore the equivalent of a verification or unsworn declaration.  Although the Court does not agree with the Debtor's position, the Court need not dispose of the matter on Rule 1008 grounds, as there are other grounds warranting disallowance of the Debtor's amendments.

Moran next argues that the Debtor should not be allowed to amend his schedules because the Debtor has acted in bad faith.  Bankruptcy Rule 1009(a) provides that "[a] voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed."  Fed. R. Bankr. P. 1009(a).  Despite this permissive language, the Court may "deny the amendment of exemptions where the amendment would prejudice creditors or where the debtor has acted in bad faith or concealed assets."  Hannigan v. White (In re Hannigan), 409 F.3d 480, 481 (1st Cir. 2005).  "Bad faith is generally determined from an examination of the relevant surrounding circumstances" and "must be shown by clear and convincing evidence."  Wood v. Premier Capital, Inc. (In re Wood), 291 B.R. 219, 226, 228 (B.A.P. 1st Cir. 2003).  It takes more than mistake or inadvertence to constitute bad faith, "there must be some form of deception."  McFatter v. Cage, 204 B.R. 503, 508 (S.D. Tex. 1996).

The Debtor began his bankruptcy case by suppressing any notion that he lived in New York.  He maintained this throughout the 341 meeting and Rule 2004 examination, yet, at the same time, gave conflicting information.  The Court has previously found that the Debtor's domicile or primary residence was not New Hampshire.  (Ct. Doc. No. 62.)  The Debtor spent most of his time in New York.  He signed a second home rider with his mortgagee that the New Hampshire property was a second home, a home at which his parents, at the time the Debtor filed bankruptcy, lived in and held the utilities in their names.  The Debtor kept a New York driver's license and his car registered there.  He did not register it in New Hampshire because he knew he did not live in New Hampshire, stating he had "a problem once before with living in one place [and] having a car registered elsewhere."  (Moran's Ex. B at 107.)  The Debtor continued post-petition to pay rent on an office space in New York that he intended to reopen.  His connection to New York and his use of his parents' house exceeded simply using the New York address

out of convenience when he was out of the country for military purposes.  By the same token, the Debtor used the New Hampshire property sparingly.  Except for owning a second home in New Hampshire, the Debtor has demonstrated almost zero connections to the State.  While some debtors in his situation might claim a second home as a domicile not due to bad faith but due to ignorance, this Debtor is an attorney with significant experience with bankruptcy law.  The Court is convinced that when he filed his petition, the Debtor knew that he was improperly claiming New Hampshire exemptions.  He has repeatedly denied living in New York, but now that the Court has determined that he does not live in New Hampshire, he claims by his amendments that he lives in New York.

      The Court does not overlook the fact that the Debtor is in a pickle.  Many debtors in his situation would try to amend their exemptions after being denied their initial exemptions, and this case could have turned out differently.  The Debtor could have been forthright with the Court.  If he was unsure about which state's exemptions he was entitled to, he could have claimed exemptions in the state he thought appropriate while also disclosing his other address.  If Moran objected to the exemptions and the Court agreed with Moran, the Debtor could probably have amended his schedules to claim exemptions under the law of the other state.  However, the Debtor instead concealed his New York address from the Court and repeatedly maintained that he lived in New Hampshire.  Unfortunately for the Debtor, his explanation has significant holes in it.  Even if the Debtor did intend to make New Hampshire his home, the evidence shows that he knew that it was not his home as of the petition date.

      As for bad faith with regard to the Debtor's undervaluing of his retirement plan, the Debtor maintains that he did not intentionally undervalue his Fidelity accounts.  The Debtor explains that the undervaluation was simply because he used the March 2004 statement when he valued the Fidelity accounts.  However, Schedule C explicitly requires a debtor to list the current market values of his interests in property.  The Debtor filed his petition in October 2005 yet used an account statement from March 2004 that showed the value as $100,929.82.  Then when the Debtor amended his schedules in August 2006 he again used the March 2004 account statement to provide the "current" market value of

the Fidelity accounts.  It was not until Moran examined the Debtor at a Rule 2004 examination and filed a motion to compel production of more recent statements, which was granted by this Court, that the Debtor produced more current statements in November 2006.  The statements reveal that as of September 14, 2005—one month prior to the petition date—the account was worth $136,273.39, almost $36,000 more than the Debtor claimed it to be, and worth $146,451.39 as of June 12, 2006, more than two months before he filed his amended schedules.  (Moran's Exs. M and N.)

   The Debtor argues that there was no bad faith because he had no motive to choose New Hampshire exemptions over New York exemptions or to undervalue his retirement accounts.  However, there were potential benefits to claiming New Hampshire exemptions.  For instance, because the Debtor owned the New Hampshire home but not his parents' New York home, he could claim a $100,000 New Hampshire homestead exemption whereas he could not claim a homestead exemption in New York.  N.H. Rev. Stat. Ann. § 480:1 (2003); N.Y. C.P.L.R. 5206(a) (McKinney 2005).

   The Debtor argues that there was no harm in undervaluing the accounts because retirement accounts are exempt under both New Hampshire law and New York law.  This argument was rejected in In re Hannigan, 409 F.3d at 483, in which the court explained that whether an undervaluation is material is not the point, instead emphasizing that "[a] bankruptcy court is entitled to insist upon filings and representations made in utmost good faith."  In In re Hannigan, the debtor initially valued his homestead at $135,000 and later moved to amend his schedules to claim the full value of the Massachusetts homestead exemption, $300,000.  Id. at 481.  The court denied the debtor's motion to amend because he had continually and intentionally undervalued his homestead by excluding one of two parcels comprising the homestead.  Id. at 483–84.  The court noted the irony that had the debtor been truthful from the beginning, he probably would have been entitled to the full exemption that he sought by amendment.  However, despite his efforts being "misguided" and that "[h]e may have simply misunderstood where his better interests lay[,]" the court concluded as follows: "This is not to say that mere carelessness or oversight would be sufficient to show bad faith or concealment.  But bad faith may encompass intentional

conduct that, in retrospect, was not in the actor's best interest." Id. (discussing a similar outcome in In re Bauer, 298 B.R. 353, 357 (B.A.P. 8th Cir. 2003), in which the court disallowed the debtors' amendment because of bad faith and noted that "[t]he irony here is that if the Debtors had accurately disclosed the true value of their home from the outset, they may have been entitled to exempt their equity in it").

Further, the Debtor's contention that the undervaluation is immaterial because retirement accounts are equally exempt in both states is erroneous. In New York, unlike New Hampshire, the Debtor cannot claim as exempt any additions made to the retirement account "after the date that is ninety days before the interposition of [Moran's] claim." N.Y. C.P.L.R. 5205(c); N.H. Rev. Stat. Ann. § 511:2. According to Moran (and not disputed by the Debtor), he instituted his state court action against the Debtor on November 3, 2003, and ninety days prior to that was August 5, 2003. (Moran's Ex. P.) A summary prepared by Moran's accountant, to which the Debtor did not object, shows that the Debtor made additions totaling $18,627.88 to his retirement accounts between August 5, 2003, and September 12, 2006. (Moran's Ex. P.) These additions (plus any additions made after September 12, 2006) would probably be exempt under New Hampshire law but not under New York law.

In considering the totality of the circumstances, the evidence of the Debtor's bad faith with regard to the amendments is clear and convincing. The Debtor—a former bankruptcy attorney—is well aware of his duty to be truthful in his filings and representations to the Court. The Debtor repeatedly denied living in New York, but now that the Court denied his New Hampshire exemptions, he claims to live in New York. The Debtor has also twice undervalued his Fidelity accounts. The Debtor not only has a duty to disclose his assets but he also has a duty "to amend [his] schedules whenever it becomes necessary to insure accuracy and reliability of information disclosed therein." Vidal v. Doral Bank Corp. 363 F. Supp. 2d 19, 22 (D. Puerto Rico 2005) (quotations omitted). In response to the Court's order compelling the Debtor to provide Moran with documents, the Debtor finally requested updated account statements from Fidelity, which he received in November 2006. The Debtor has yet to amend his schedules to reflect a

more recent value of these accounts, despite their value having risen approximately fifty percent.[5] This failure on the part of the Debtor to willingly provide accurate information to the Court is representative of his management of his bankruptcy case. The Court has previously denied the Debtor's discharge because of his bad faith concealment of mortgage proceeds, and, as in Ward v. Turner, 176 B.R. 424, 426 (E.D. La. 1994), bad faith is "a recurring theme" in this case. Accordingly, the Debtor's proposed amendments to Schedule C in which he claims exemptions under New York law are disallowed.

## CONCLUSION

This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. The Court will issue a separate order consistent with this opinion.

DATED this 6th day of June, 2007, at Manchester, New Hampshire.

/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge

---

[5] Similarly, as discussed in this Court's prior opinion denying the Debtor's discharge, the Debtor waited eight months from the time he conceded the existence of a second mortgage to the time he amended his schedules accordingly.